FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN [ ] [ ] ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
Gary Creddille,

                Plaintiff,

    -against-

The MTA NYC Transit Authority and Core
Environmental Corp.,

                Defendants.
-----------------------------------------------------------x

**MEMORANDUM AND ORDER**

11-cv-5442; 11-cv-5443; 11-cv-5444
(SLT) (RLM)

**TOWNES, United States District Judge,**

      Gary Creddille, brings this action against defendants, the New York City Transit Authority and Core Environmental, Inc. ("Core"), alleging that in 2009 and 2010, while employed by Core, he was subjected to discrimination on the basis of race and national origin by a Transit Authority employee at a Transit Authority jobsite, and subsequently terminated on account of his good faith opposition to those discriminatory practices. He alleges discrimination claims against the Transit Authority and retaliation claims against both the Transit Authority and Core under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq*. Currently before the Court are defendants' motions for summary judgment. For the following reasons, defendants' motions are granted.

      Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of material fact, a court resolves all ambiguities and draws all justifiable inferences in favor of the non-moving

party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). With that in mind, the pertinent facts, undisputed, or where disputed considered in Plaintiff's favor, are as follows:

## FACTUAL BACKGROUND

The gist of Creddille's prolix allegations is that an African-Nigerian Transit Authority employee, Martin Merenini, mistreated Creddille, an African-American, on several occasions in late 2009 and 2010, on account of his race and national origin. At the time, Creddille was employed by Core, a contractor hired by the Transit Authority, as a lead inspector. In August 2010, Creddille complained about Merenini to the Transit Authority. In January 2011, Core purportedly terminated him in retaliation for making that complaint.

Core is an environmental consulting firm that provides, *inter alia*, lead and asbestos monitors who monitor construction sites to ensure that lead paint, asbestos, and other hazardous materials are handled and disposed of in accordance with applicable laws. (Core's 56.1 Stmt. ¶ 1.) The Transit Authority is one of Core's largest clients, accounting for more than half of Core's gross revenue. (TA 56.1 Stmt. ¶¶ 4-5; Core 56.1 Stmt. ¶ 2.) It engages Core's consulting services in connection with certain Transit Authority construction and rehabilitation projects. (TA 56.1 Stmt. at ¶ 6.)

In August 2008, after an interview with Mary Bryzowski, a Core Project Manager, Creddille was hired as a certified asbestos inspector on an hourly "as-need[ed]" basis, earning $20.00/hour. (TA 56.1 Stmt. ¶¶ 9-10; T. Tramposch Aff. ¶¶ 14, 17, Ex. B; R. Tramposch Aff. ¶ 3.) Although hired on a part-time basis, Core often assigned Creddille full time hours. (Pl.'s 56.1 Stmt. ¶ 21.) Core set his hours and paid his wages, as well as bonuses in 2009 and 2010. (TA 56.1 Stmt. ¶ 12.) Core trained Creddille, including paying for his lead inspection training

2

and certification. (*Id.* at ¶¶ 11, 15.) Creddille was supervised by Core supervisors, who, in turn, were accountable to Core's clients, including the Transit Authority. (Pl.'s 56.1 Stmt. ¶ 13.)

Core was hired by the Transit Authority to perform lead and asbestos inspection duties on several Transit Authority construction projects, to which it dispatched its team of lead and asbestos inspectors. In December 2009, Core assigned Creddille to oversee lead abatement work to be performed by a third-party contracting company, Kiska Construction, at a Transit Authority location – the Roosevelt Avenue Station – where Martin Merenini was the Transit Authority's Resident Engineer. (TA 56.1 Stmt. ¶¶ 20-22.) Credille's job responsibilities included monitoring, documenting, reporting, and seeking corrective action in connection with lead and asbestos handling at the site. (*Id.* at ¶ 19.) Merenini's job responsibilities included monitoring Kiska's and Core's work.

Credille and Merenini had several job disputes. According to the Transit Authority, Merenini was concerned that Creddille was not adequately monitoring lead abatement work, spent too much time in the field office instead of at the worksite, improperly reported in the mornings to a waste storage area instead of the worksite, and, on June 16, 2010, arrived to work late and acted improperly with regard to a site correction form and inspection by a Transit Authority Office of System Safety Inspector, Robert Miller. (*Id.* at ¶¶ 23-24.) According to Core, the June 16, 2010 incident was the third incident involving Creddille and Transit Authority employees. (Core 56.1 Stmt. ¶¶ 24.) The two previous incidents did not involve Merenini. (Pl.'s 56.1 Stmt. ¶¶ 22-23.) The Transit Authority reported to Core that Creddille "[a] arrived late, delaying the start of demolition work, [b] refused to go up to the top of the elevated tracks, where the demolition work was being done, and [c] argued with, and 'bumped,' Martin Merenini, Transit's on-site safety inspector." (Core 56.1 Stmt. ¶ 24.) Creddille contends that

3

Merenini "hardly ever spoke" to Creddille because "Merenini didn't like the plaintiff because he was a [*sic*] African American." (Pl.'s 56.1 Stmt. at p.13.) He contends that on June 16, 2009, Merenini and Creddille had a dispute after Inspector Miller found "deficiencies" at the site, and Merenini told him, "this is another reason why he don't [*sic*] like African Americans and the plaintiff because the plaintiff was African American." (Pl.'s 56.1 Stmt. at p.14.) The Transit Authority called a meeting with Core supervisors to discuss and investigate this incident and/or the mishandling of lead at the worksite. (R. Tramposch Aff. ¶ 13; Pl.'s 56.1 Stmt. at p.14.)

By letter dated August 23, 2010, Plaintiff made a written complaint to the Transit Authority alleging racial discrimination by Merenini in June and July of 2010. (TA 56.1 Stmt. ¶¶ 25-27.) Before filing the complaint, Plaintiff notified his supervisors at Core of his intention to lodge a complaint of discrimination against Merenini and requested to be transferred to a different job site. (TA 56.1 Stmt. ¶¶28-30.) Core – at Creddille's request – relocated Creddille to a new worksite, where he would receive the same pay and have the same responsibilities, but would have no contact with Merenini. (Core 56.1 Stmt. ¶ 25; TA 56.1 Stmt. ¶¶ 36-37; R. Tramposch Aff ¶ 11.) The Transit Authority investigated the complaint, found no evidence of racial animus, and concluded that the disputes between Merenini and Creddille were job-related. (TA 56.1 Stmt. ¶¶ 33-35.)

Core transferred Creddille – per his request – from the Roosevelt Avenue Station to the Beach 98th Street worksite, where he was to serve as a lead inspector. (R. Tramposch Aff. ¶ 14.) One of his colleagues, Troy Henderson, was assigned in the same capacity to the Beach 105th Street worksite. (*Id.* at ¶¶ 16-17) On January 6, 2011, Creddille once again encountered Transit Authority Safety Inspector Miller, whom he had previously encountered – without incident – at the Roosevelt Avenue Station. (TA 56.1 Stmt. ¶¶ 38-39.) Before noon that day, Creddille's

supervisor at Core contacted Creddille looking for Henderson, who was missing from his job site. Although Creddille had seen Henderson at the Beach 98th Street worksite, Creddille did not inform his supervisor of this. Instead, he drove Henderson back to his job site. (R. Tramposch Aff. ¶¶ 17-18.) While Creddille was away, Miller came to inspect the progress of the lead abatement at the Beach 98th Street worksite and found numerous violations. Specifically, he found "[a] no poly [i.e., collection tarp] in the lift bucket being used by the demolition contractor and [b] loose lead paint chips on the ground at the work site." (Core 56.1 Stmt. ¶ 31.) When Creddille returned, he and Miller had a verbal altercation during which, according to the Transit Authority, Creddille threatened to "fix" Miller. (TA 56.1 Stmt. ¶¶ 40-44; Core 56.1 Stmt. ¶ 32.) Creddille denies threatening Miller. (Pl.'s 56.1 Stmt. at p.21.) He contends that Miller was "so angry, hyper active [sic], hostile and trying to get even with the plaintiff for complaining about ... Martin Merenini racial discriminatory [sic] actions and his own instigating actions...." (Id. at p.20, 23.)

Following the January 6, 2011 incident at the Beach 98th Street worksite, Core issued an Employee Warning Notice to Creddille for failing to inform his supervisor that Henderson was at the Beach 98th Street location. Core Project Manager Vladimir Ortiz, one of Creddille's supervisors, notified Creddille that he had to sign the warning in order to return to his job site. Creddille refused. (Ortiz Aff. ¶ 9.) At that meeting, Ortiz informed Creddille that the Transit Authority had requested that Creddille not be assigned to Transit Authority projects, and that Core intended to use Creddille for "other, non-Transit work, including NYC School Construction Authority work." (Id. at ¶ 10.) Core contends that it did not then (or at any point thereafter) terminate Creddille's employment. (Core 56.1 Stmt. ¶ 9.)

5

Credille contends that on January 11, 2011, he was terminated by a Core supervisor, Ron Tramposch, during a telephone conversation. Tramposch allegedly stated, "Gary, if you really want to push me[,] we won't give you anymore work at all." (Pl.'s 56.1 Stmt. at ¶ 9.) Tramposch denies terminating or suspending Creddille or threatening to do so. (R. Tramposch Aff. ¶ 21.) It is undisputed that after the January 2011 incident, Creddille stopped working for Core. He testified that he started working on a full-time basis for one of Core's competitors, Landmark Environmental, from January to June 2011. (1st Creddille Dep. at 42-44.) He continued to work for Landmark until October 2011. (Pl.'s 56.1 Stmt. ¶ 60.) Core offered Creddille assignments in March, April, and May of 2011, but Creddille refused them. (1st Creddille Dep. at 140; Core 56.1 Stmt. ¶¶ 10-11.)[1] Core repeatedly asked Creddille to resume his employment with Core, and offered Creddille employment "at least eight times in February – May 2012" but Creddille refused each offer. (Core 56.1 Stmt. ¶¶ 11-16.) Creddille explains that he "is not going to resume work back with Core Environmental because that's the plaintiff Gary Creddille [sic] constitutional right, once again. It is a conflict of interest for a plaintiff to work back [sic] for a company he or she is suing for a civil rights action." (Creddille's 56.1 Stmt. ¶¶ 10-11.)

---

[1] Although he testified in his deposition that he told the EEOC investigator that he was offered employment in 2011, Creddille contends in his Local Rule 56.1 Statement that Core did not offer him work during 2011 and "[t]he EEOC investigator had a disability and the plaintiff was taught as a child[] not to entertain disputes or argue with someone who has a disability, because plaintiff believes in God," so he let her "wr[i]te whatever she wanted to write." (Creddille's 56.1 Stmt. ¶¶ 10-11.) This Court credits plaintiff's initial deposition testimony, which was subject to cross-examination, as well as the affidavit of Core's sole shareholder Teresa Tramposch, who affirms that Core repeatedly offered Creddille comparable work in 2011 and 2012 (T. Tramposch Aff. ¶¶ 11-13). *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled ... that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."). In any event, the analysis would not change if Core had not offered Creddille employment in 2011.

**Charges of Discrimination**

Creddille filed a charge of discrimination with the EEOC on February 15, 2011 against the Transit Authority, attaching the August 23, 2010 complaint he made with the Transit Authority, alleging that Merenini discriminated against him between June and July of 2010 on the basis of race. (Seda Decl. Ex. M.) Creddille filed an Amended EEOC complaint on March 28, 2011 adding that he was discriminated against on the basis of national origin. (Seda Decl. Ex. N)

On March 28, 2011, Creddille filed a second EEOC complaint, this time alleging that he was retaliated against in violation of Title VII by both the Transit Authority and Core. He claimed that he was issued the January 2011 warning and then terminated by Core because of his good faith opposition to discriminatory practices. (Seda Decl. Ex. O.)

On August 4, 2011, the EEOC dismissed both charges and issued Right to Sue letters, finding that the disputes between Merenini and Creddille were job related and that Core issued the January 2011 warning in response to Creddille's misconduct on a Transit Authority worksite days earlier, not his complaints of discrimination months earlier. (Seda Decl. Exs. P & Q.)

**The Complaints and Instant Motions**

Creddille filed three *pro se* complaints, proceeding *in forma pauperis*, against the Transit Authority and Core, under docket numbers 11-cv-5542, 11-cv-5443, and 11-cv-5444. On February 28, 2013, the actions under docket numbers 11-cv-5443 and 11-cv-5444 were dismissed on consent.

The defendants now move for summary judgment in the remaining action. The Transit Authority moves on the grounds that it was not Creddille's employer, and thus cannot be held liable for discrimination under Title VII, and even if it were, Creddille has failed to establish

7

liability against the Transit Authority. Core moves on the grounds that Creddille has not suffered an adverse employment action, there is no causal connection between Creddille's protected activity and alleged termination, and if it had terminated Creddille, Core had legitimate, non-discriminatory reasons for doing so. For the following reasons, this Court grants defendants' motions.

## DISCUSSION

### I. *The Transit Authority Did Not Employ Plaintiff*

Title VII makes it an unlawful employment practice for an employer, employment agency or labor organization to "fail or refuse to hire or to discharge any individual" or to "limit, segregate, or classify his employees" because of such individual's "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1)-(2), or to retaliate against an employee "because he has opposed an[ unlawful] practice" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII, 42 U.S.C.A. § 2000e-3(a). The existence of an employer-employee relationship is paramount. *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006).

Courts apply the "general common law of agency" to determine whether an individual qualifies as an employee under Title VII. *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 740 (1989). In *Reid*, the Supreme Court articulated thirteen non-exclusive factors for district courts to consider in determining whether an individual is an employee within the meaning of Title VII.[2] *Id.* at 751–752. "In this Circuit, ... 'a prerequisite to considering whether

---

[2] Those factors are: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of

8

an individual is [an employee] under common-law agency principles is that the individual have been *hired* in the first instance.'" *Gulino*, 460 F.3d at 372 (emphasis in *Gulino*) (quoting *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (finding the *Reid* framework for determining whether a person is hired as an employee or independent contractor "is flawed because it ignores the antecedent question of whether [the plaintiff] was hired ... for any purpose.") In determining whether a person has been "hired," the Second Circuit looks "primarily to 'whether [a plaintiff] has received direct or indirect remuneration from the alleged employer.'" *Id.* (quoting *Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 473 (2d Cir. 1999) (internal quotation marks omitted)). "Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because ... compensation ... is an essential condition to the existence of an employer-employee relationship." *O'Connor*, 126 F.3d at 115-16 (internal quotation marks and citations omitted); *see also York v. Ass'n of the Bar*, 286 F.3d 122, 126 (2d Cir. 2002) (noting that whether someone is an employee under Title VII usually "turns on whether he or she has received direct or indirect remuneration" and without "financial benefit," no employment relationship can be said to exist.) Here, it is undisputed that Creddille was not compensated by the Transit Authority. Thus, Creddille was not a Transit Authority employee.

However, Title VII liability may be extended to entities other than a person's direct employer under certain limited circumstances. As relevant here, under the "joint employer" doctrine, "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively

---

payment; (9) the hired party's role in hiring and paying the assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) and the tax treatment of the hired party. *Id.* at 751-752.

9

employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Arculeo v. On-Site Sales & Mktg., L.L.C.*, 425 F.3d 193, 198 (2d Cir. 2005). "A joint employer relationship may be found to exist where there is sufficient evidence that [one entity] had immediate control over the other company's employees." *NLRB v. Solid Waste Services, Inc.*, 38 F.3d 93, 94 (2d Cir. 1994). "Relevant factors include commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Id.*; *see also Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985) (The "joint employer" doctrine applies when two "separate legal entities ... chose[] to handle certain aspects of their employer-employee relationships jointly."). In *Clinton's Ditch*, the Second Circuit emphasized that "an essential element under any determination of joint employer status in a subcontracting context is ... *sufficient evidence of immediate control over the employees.*" *Clinton's Ditch*, 778 F.2d at 138 (emphasis added).

Here, there is absolutely no evidence in the record that the Transit Authority exercised any meaningful control over Core's employees. Although Core's employees worked at Transit Authority worksites maintained by Transit Authority employees, Core was ultimately responsible for the hiring and firing, discipline, pay, insurance, record-keeping and supervision of Core's employees. Indeed, there is no evidence that the Transit Authority was, in any way, involved in the hiring, firing, discipline, pay, insurance, or records of Core's employees. Creddille was hired by Mary Bryzowski, a Core employer. TA 56.1 Stmt. ¶¶ 9-10. Core paid Creddille his wages and bonuses. *Id.* at ¶ 12. He was disciplined by Core employees, for example he received a written warning from Vladimir Ortiz on January 10, 2011 for lying to a Core employee about another colleague's whereabouts. Ortiz Decl. ¶¶ 9-10. Indeed, Creddille

contends that it was Core – by a telephone conversation with Ron Tramposch – that purportedly terminated his employment. Moreover, the contract between the Transit Authority and Core expressly provides that "[t]he relationship of the Consultant [Core] to the [Transit Authority] is that of an independent contractor and [Core] ... agrees that it will conduct itself consistent with such status, that it will neither hold itself out as nor claim to be an officer or employee of ... [the Transit Authority]." Seda Decl. Ex. F at Art. 25; *Martin v. Purolater Courier*, 94 CV 1004 (FB), 1996 WL 429016, at *4 (E.D.N.Y. July 25, 1996) ("[T]he joint employer issue does not turn on the perceptions of the employee since employee control is primarily a function of the objective relationship and understandings of the affected employers.") To the extent that Creddille contends that the Transit Authority was his joint employer because Transit Authority employees oversaw the work of all contractors, including Core's employees, on Transit Authority job sites, such supervision does not, in and of itself, create a joint employer relationship. *AT&T v. NLRB*, 67 F.3d 446, 452 (2d Cir. 1995) ("Limited and routine supervision, without an ability to hire, fire, or discipline, cannot justify a finding of joint employer status."); *see also Lans v. Kiska Construction Corp.*, No. 96 Civ. 4114, 1997 WL 313162, at *4 (S.D.N.Y. April 18, 1997) (finding that if, by virtue of a supervisory relationship over construction contracts, the DOT "were held to be plaintiff's employer ..., DOT and numerous other federal, state and local government agencies would be held to be 'employers' of all of the workers employed by independent companies who contract to do construction projects or otherwise provide goods and/or services to or for the government.") In *Lans*, the Court acknowledged that there may be "some cases [in which] the government agency will so closely supervise and direct a project's employees as to make it a Title VII employer." *Id.* However, that is not the case here. Indeed, Creddille testified that he was an "independent monitor" and was expected to exercise his

independent judgment to ensure compliance with applicable laws. (Creddille Dep. 32-36.) The Transit Authority was not Creddille's employer, neither directly nor under a joint employer theory. Accordingly, the Transit Authority's motion for summary judgment is granted.

## *II.  Retaliation Claims against Core*

As a preliminary matter, that Creddille lodged a discrimination complaint against the Transit Authority is not fatal to his Title VII retaliation claim against Core. *Martin v. Purolater Courier*, 94 CV 1004 (FB), 1996 WL 429016, at *8 (E.D.N.Y. July 25, 1996) ("[R]etaliatory animus is not negated merely because a plaintiff engages in protected activity against a different employer. It is possible that [the employer] could harbor prejudice against [the plaintiff] if and when it learned that he had brought a discrimination complaint against [a non-employer]. Indeed, a new employer might wish to rid itself of an employee who is wont to bringing discrimination claims.") However, this Court nonetheless grants Core's motion for summary judgment because Creddille has not established a *prima facie* case of retaliation.

Claims alleging retaliation under Title VII are analyzed under a three-step burden-shifting analysis. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Those three steps are as follows. First, the plaintiff must establish a *prima facie* case. To do so, the employee is required to show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001). Second, "[i]f a plaintiff sustains the initial burden, a presumption of retaliation arises ... [and the burden shifts to] the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* Finally, "once an employer offers such proof, the presumption of retaliation dissipates and the employee

must show that retaliation was a substantial reason for the adverse employment action." *Id.* The plaintiff's initial burden – establishing a *prima facie* case – is not exacting. *Id.* (explaining that the Title VII plaintiff's burden of proof "at the *prima facie* stage has been characterized as 'minimal' and '*de minimis.*'" (quotations omitted)). At this initial stage, "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.*

Here, Creddille has not met that burden. Although he has established the first two prongs of a *prima facie* case, he has not met his burden of establishing that he suffered an adverse employment action as a result of participating in a protected activity – complaining on August 23, 2010 to the Transit Authority concerning Merenini's allegedly discriminatory behavior. Moreover, even if Creddille's employment had been terminated, as he alleges, he has not established any causal connection between his good faith opposition to the Transit Authority's unlawful conduct and his purported January 11, 2011 termination.

The "standard for an adverse employment action in retaliation claims is considerably broader than the standard for discrimination claims under Title VII." *Vaughn v. City of New York*, No. 06–CV–6547, 2010 WL 2076926, at *14 (E.D.N.Y. May 24, 2010) (citing *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)). In the context of a discrimination claim, the plaintiff must demonstrate a "materially adverse change in the terms and conditions of employment." *Sanders v. New York City Human Resources Administration*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted). By contrast, in the context of a retaliation claim, a plaintiff need only demonstrate "employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and employers." *Burlington Northern*, 548 U.S. at 68 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). The

13

determination of whether an employer's conduct suffices under this test turns on "material adversity," because "it is important to separate significant from trivial harms." *Id.* Material adversity "will often depend upon the particular circumstances ... [and] petty slights, minor annoyances, and simple lack of good manners" are insufficient. *Id.*

Here, Creddille contends that he complained about discrimination on August 23, 2010. Immediately after lodging his complaint, he was assigned to different worksite. This was not an adverse employment action because the reassignment (doing the same work, at the same pay and the same number of hours) was made at his request.

After he had a dispute with another Transit Authority employee in January 2011, Ron Tramposch threatened not to assign Creddille to any more jobs. According to Creddille, Tramposch stated, in a telephone conversation concerning Creddille's conduct on January 6, 2011 at the Beach 105th Street worksite: "Gary, if you really want to push me[,] we won't give you anymore work at all." (Pl.'s 56.1 Stmt. at ¶ 9.) Following this conversation, another Core supervisor, Ortiz, told Creddille that he would not be staffed on other Transit Authority projects, but would be staffed on "other, non-Transit work, including NYC School Construction Authority work." (Ortiz Aff. at ¶ 10.) On many occasions since, Core has invited Creddille to return to work and on each occasion, he has refused. Instead, Creddille immediately took work with one of Core's competitors. No rational trier of fact could find that Core terminated Creddille's employment. *See Kearse v. ATC Healthcare Servs.*, 12 CIV. 233 NRB, 2014 WL 958738, at *6 (S.D.N.Y. Mar. 11, 2014) (finding no adverse employment action where evidence established that plaintiff voluntarily resigned his position).[3] It is not disputed that Creddille and Tramposch

---

[3] Creddille speculates that non-Transit Authority work could have been inferior because Core's other major client, the School Construction Authority, only provides Core with work

14

had one heated conversation, but one heated conversation does not amount to an adverse employment action.

Even if Creddille had experienced an adverse employment action on January 11, 2011, there is no causal connection between that action and his August 2010 complaint of discrimination. A plaintiff may establish a causal connection between a protected activity and an adverse employment action either (1) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment" or (2) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Here, Creddille has no evidence of retaliatory animus, thus his claim rests on the temporal proximity between (1) filing a complaint with the Transit Authority in August 2010 and (2) being purportedly terminated on January 11, 2011. Generally, "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality ... [if] the temporal proximity [is] 'very close.'" *Clark County School Disrict v. Breeden*, 532 U.S. 268, 273 (2001). Although the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gormon–Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (collecting cases), an interval of five months is too long, *Cody v. Cnty. of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009) (summary order). *See also Ashok v. Barnhart*, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003) (collecting cases); *Lambert v. New York State Office of Mental Health*, 97–CV–1347 (JG), 2000 WL 574193 at *9-10 (E.D.N.Y. Apr. 24, 2000) (passage of five months too long to establish retaliation for an

---

during summers when children are not in its facilities. However, Creddille's speculations do not negate the fact that he voluntarily ceased his employment relationship with Core.

EEOC complaint); *Bell v. Metro. Transp. Auth.*, 12 CIV. 1235 AKH, 2013 WL 8112461, at *6 (S.D.N.Y. Nov. 1, 2013) (passage of five months between filing complaint and a reprimand and transfer "is not the very close proximity of time that would allow a jury to infer retaliation").

Creddille has failed to establish a *prima facie* case of retaliation. Accordingly, Core's motion for summary judgment is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are granted. The Clerk of Court is respectfully requested to enter judgment and close the case.

**SO ORDERED.**

/s/(SLT)

———————————————
SANDRA L. TOWNES
United States District Judge

Brooklyn, New York
Dated: June 25, 2014